STATE of Missouri, Plaintiff–
Respondent,

v.

Michael GREEN, Defendant–Appellant.

No. 25662.

Missouri Court of Appeals,
Southern District,
Division One.

June 21, 2004.

**838**

Ellen H. Flottman, Columbia, MO, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrea Mazza Follett, Assistant Attorney General, Jefferson City, MO, for plaintiff-respondent.

JAMES K. PREWITT, Judge.

Following jury trial, Michael Green ("Defendant") was convicted of two counts of child molestation in the first degree, in violation of § 566.067, RSMo 2000. He was sentenced to seven years' imprisonment on each count, with the sentences to be served consecutively.

Defendant raises two points on appeal and contends that the trial court abused its discretion in overruling his objection to a portion of the State's opening argument in which reference was made to the guilty plea of the victim's father, and in overruling Defendant's request for a mistrial during the State's closing argument after the prosecutor indicated that his "top ten fear [was] that an opportunist will be given another opportunity to harm a child."

### Facts

Defendant does not challenge the sufficiency of the evidence. Viewed in the light most favorable to the verdict, the following evidence was adduced at trial. T.S., a child who was eleven years old in the summer of 2000, lived in Wentworth, Missouri with his adoptive parents, J.S. ("Father") and K.S. ("Mother"). T.S. had been adopted by Father and Mother when he was six years old. Father and Mother owned a general store that "[s]old milk and a few groceries[.]" Within the store was a workout room, in which T.S. and others would lift weights. One of the people with whom T.S. would lift weights was Defendant who, according to the date of birth indicated in the record, was 52 years old in the summer of 2000.

Defendant and T.S. became friends quickly and Defendant invited T.S. to his home, which was in close proximity to the store, within the first week they met. Defendant and T.S. would do "fun stuff, normal stuff[,]" and eventually talked about girls and sex. T.S. shared with Defendant that Father had been abusive toward T.S., both physically and sexually. Defendant was the first person T.S. had told about the abuse and, prior to the summer of 2000, the only one in whom T.S. had confided. Defendant assured T.S. that he would help him.

The abuse of Father toward T.S. included Father forcing T.S. to shower with him, often on Sundays, during which Father would ejaculate and tell T.S., "that was . . . the next generation going down the drain." Father would encourage T.S. to fondle him, at times telling T.S., "I'm the father. You're the child. You have to do what I say." Father had also struck T.S. in the head, kicked him in the testicles, and choked him. This abuse "had been ongoing for quite a long time."

After T.S. told Defendant about the abuse, T.S. began spending more time at Defendant's house, going over there every day. When the two discussed sex, it was

Defendant who initiated the conversations, which were primarily about sex between men and men, or boys and men. Defendant also showed T.S. magazines that depicted sexual acts.

In addition to conversations about sex, Defendant asked T.S. to participate in sexual activities, asking T.S. "to masturbate [Defendant.]" Defendant would also masturbate T.S. These activities would occur more than twice a week at Defendant's home, and sometimes while both were in the shower. T.S. frequently performed oral sex on Defendant, and on one occasion Defendant asked T.S. "[t]o put [his] penis in [Defendant's] butt." T.S. attempted to do as Defendant asked, but was unable to accomplish the act; Defendant also tried to perform the act on T.S., but also was unable to accomplish it.

In September 2000, the Division of Family Services ("DFS") investigated a hotline call in which it was alleged that T.S. had been abused by Father. The hotline call was not coded as an emergency because it was determined that, at the time the report was taken, T.S. was not in the home of the alleged perpetrator. When contact was made by DFS the morning after the hotline call, T.S. was staying where he had been the night before, at the home of family friends (the Davises), and T.S. had been dropped off there by Defendant, who told the Davises that T.S. was being molested by Father.

The DFS investigator, Diana White, spoke with T.S., who relayed to White the allegations of abuse of Father toward T.S. detailed earlier. After White had finished speaking with T.S., Father pulled into the Davises' driveway to pick T.S. up for mass. White introduced herself (she had spoken with Father the night before to ask that T.S. be allowed to stay with the Davises) and Father began volunteering information regarding events that had happened when Father and T.S. showered. White attempted to excuse herself, but Father continued making statements, including "that there were some things that [DFS] needed to look into, [and] that other people would be involved[.]"

White was also present when T.S. was interviewed by Detective Dwayne Allen of the Newton County Sheriff's Department. At some point the investigation led White and Allen to speak with Defendant, which occurred within two to three days of the hotline call. Defendant admitted that he had knowledge that T.S. had been abused by Father. Defendant was not arrested that day, nor placed into custody, but Allen did "invite [Defendant] down to the sheriff's department[.]" During the same time period, T.S. was placed in foster care and Father was arrested.

The day following the invitation, Defendant voluntarily went to the sheriff's department to speak with Allen. Although Defendant was neither in custody nor under arrest, Allen read Defendant "his rights per Miranda[.]" Defendant read the Miranda warning form and signed it.

Allen asked Defendant whether he had sexually abused T.S., which Defendant initially denied. Allen eventually began audiotaping the interview in clear view of Defendant. Under questioning, Defendant first acknowledged that he had touched T.S. on top of his clothing, but later admitted that he had touched T.S.'s bare penis. Defendant explained the context of the touching by indicating that he and T.S. would wrestle while both were in their underwear and sometimes T.S.'s "penis would fall out[,]" and Defendant would eventually be the one to place T.S.'s penis back into T.S.'s boxer shorts.

According to Defendant, he used the wrestling as a way to gain T.S.'s trust and confidence and to prove to T.S. that T.S.

could be touched in those areas without having sex. Defendant felt that if he could accomplish this, T.S. "would be more apt to disclose things to [Defendant, as Defendant] ... was wanting to find out more about the sexual abuse[.]"

Defendant initially denied experiencing any physical arousal, but then admitted that he had at least a partial erection. As for T.S., Defendant indicated that T.S. was physically aroused "about every time [Defendant] saw him." Defendant admitted to "mutual fondling" between him and T.S., in that each had touched the bare penis of the other, but denied that anything further occurred.

On May 16, 2002, Defendant was charged by information with two counts of child molestation in the first degree, in violation of § 566.067, RSMo 2000, and two counts of statutory sodomy in the first degree, in violation of § 566.062, RSMo 2000. The information also indicated that Defendant was a predatory sexual offender based on prior convictions. Following Defendant's request for a change of venue, the case was transferred from Newton County to McDonald County.

The trial was held in February 2003, and the jury returned verdicts of guilty on the two counts of child molestation in the first degree, and not guilty on the two counts of statutory sodomy in the first degree. Defendant was sentenced to two consecutive sentences of seven years. This appeal followed.

## Discussion

Defendant raises two points on appeal. Additional facts necessary to the disposition of the case are included below as we address each of those points.

*Point I—Reference to Father's guilty plea during the State's opening argument*

■ In his first point, Defendant argues that the trial court abused its discretion in overruling his objection to a reference in the State's opening argument to Father's guilty plea in a separate case based on the allegations raised against Father. According to Defendant, his state and federal constitutional rights to due process, confrontation, and a fair trial were violated, and the jury was left with the impression that the allegations against Father must have been credible.

During the State's opening statement, the prosecutor stated:

> You'll soon learn that [T.S.] was sexually abused by another significant person in his life even before he came to know [Defendant], and that man was [T.S.'s] adoptive father, ..., who after being arrested and charged, pled guilty in a Newton County courtroom. You'll also learn—

Defendant's counsel objected to the reference, stating:

> Your Honor, I object to the reference to [Father's] having pled guilty. That could be characterized as a reference to disposition of the case of the codefendant. It implies that [T.S.'s] accusation against [Father] was truthful. It implies that [T.S.'s] accusation was worthy of belief in another form. It—None of that is in front of this jury. We can't cross-examine [Father] as to why he pled guilty. We can't cross-examine the facts and circumstances of that case.

The court questioned why Defendant was unable to subpoena Father and overruled the objection, but allowed Defendant the opportunity to state additional argument in support of objection. Defendant's counsel indicated that allowing the reference would deprive Defendant of a fair trial, to a fair and impartial jury, and to due process "to be tried solely on the evidence in this case, not on the implication that [T.S.] made some truthful allega-

tion in another case." The court again overruled the objection to the reference.

In addition to the evidence presented consistent with the State's comments regarding the allegations against Father, to which Defendant did not object, when defense counsel cross-examined T.S., the following exchange occurred.

Q (by defense counsel): Now, you told Linda Kurtz (a counselor) that you wanted [Father] to go to prison; is that right?

A (by T.S.): Yes.

Q: Okay. And you had learned that [Father] just got probation instead?

A: Yes.

Q: Did [Defendant] promise you when he took you away from [Father and Mother] that [Father] would go to prison for this?

A: I don't remember.

Q: And you talked to Linda Kurtz about being disappointed that [Father] was getting a plea bargain instead of going to prison?

A: Yes.

During closing argument by defense counsel, the following comments were made.

There's more than one war here. There is a war against child abuse, and child abuse is a terrible thing, but there is a war against the false accusations and false accusers of those who have not committed abuse, but who are being called into court facing years and years in prison for something they didn't do. And that's the war Dr. [Linda] Shultz is serving.

The two wars do not have to be mutually exclusive. If the investigators do their jobs right, the right people will be caught and the right people will be put away. In this case, the right guy wasn't put away. [Father] got probation. [T.S.], as one can infer as parents, had

to be disappointed about that. Somebody has got to go to prison for what's happened to this child. I guess we should sacrifice [Defendant].

The scope of opening statements is within the discretion of the trial court. *State v. Thompson*, 68 S.W.3d 393, 395 (Mo.banc 2002). We review only for abuse of discretion. *Id.* Further, error alone does not warrant reversal. *State v. Gilbert*, 103 S.W.3d 743, 751 (Mo.banc 2003). Reversal requires prejudicial error. *Id.*

■ Defendant is correct that it is well-established in Missouri law that evidence of a codefendant's related criminal disposition, including any plea agreement, may not be used as substantive evidence to prove a defendant's guilt or innocence. *State v. Boyd*, 954 S.W.2d 602, 607 (Mo. App.1997). The rationale for the analysis is that the fundamental tenet of jurisprudence that a person is innocent until proven guilty "dictates that every defendant is entitled to be tried on the merits of his own case, without having his guilt prejudged by what has happened to any other defendant charged with the same crime." *State v. Clark*, 646 S.W.2d 409, 410–11 (Mo.App.1983). Therefore, evidence of the disposition of the case of one jointly accused is improper. *Id.*

■ The principle, however, is applicable to cases involving codefendants charged with the same crime. That is not the situation we have here. Even if we determined that it was appropriate to extend the principle to the circumstances at hand, given the references made by defense counsel to the same information, and the overwhelming evidence of Defendant's guilt, if error did occur, it was not prejudicial. Point I is denied.

*Point II—The State's comments during closing argument*

■ In his second point, Defendant contends that the trial court abused its discre-

tion in overruling his request for a mistrial following the prosecutor's comments during closing argument that his "top ten fear [was] that an opportunist will be given another opportunity to harm a child." Defendant argues that the statement injected matters into the minds of the jurors that were inappropriate for their consideration, therefore denying Defendant of his federal and state constitutional rights to due process and a fair trial before a fair and impartial jury.

During closing argument, the State referred to Defendant as an opportunist more than once. In one instance, the prosecutor noted that Defendant "admitted to fondling and touching [T.S.'s] penis with his hand, ... but then he said that that was only in order to gain his trust. I suggest to you, in fact I insist to you that [Defendant] ... is an opportunist. He's an opportunist."

Several paragraphs later, defense counsel objected to another statement by the prosecutor regarding what "the defense is going to try to convince you[.]" During the bench conference, defense counsel stated, "While we're here, Your Honor, I object to any further use and overuse of the term 'opportunist.' It carries a connotation which is not appropriate in this case." The trial court overruled the objection to the term.

During defense counsel's closing argument, she discussed fears common to everyone, and that one of the top 10 was public speaking. She continued, noting that somewhere in that top 10 fears had "to be the fear of being caught up and wrongly accused of a crime that's as horrific as the molestation of a child."

During the rebuttal portion of the State's closing argument, the prosecutor referenced defense counsel's remarks by stating, "[Defense counsel] says her top 10 fear [is] public speaking. I'll tell you what my top ten fear is. My top 10 fear is that an opportunist will be given another opportunity to harm a child."

Defense counsel immediately objected, noting that arguing future dangerousness was not proper, and was inflammatory to the jury. The court sustained the objection and defense counsel "ask[ed] that the jury be instructed to disregard [and][r]equest[ed] a mistrial." The court overruled the request for a mistrial, but did instruct the jury to "disregard the last statement made by the State."

The trial court maintains broad discretion in the control of closing arguments. *State v. Edwards,* 116 S.W.3d 511, 537 (Mo.banc 2003). We review the court's ruling for abuse of discretion. *State v. Haley,* 73 S.W.3d 746, 750 (Mo.App.2002). Reversal, however, is not required unless the error amounts to prejudicial error. *Edwards,* 116 S.W.3d at 537.

A declaration of a mistrial is a drastic remedy, which is only granted in extraordinary circumstances. *Haley,* 73 S.W.3d at 750. Whether to grant a mistrial is left to the discretion of the trial court because it is in the best position to observe the impact of the problematic remarks. *State v. Solomon,* 7 S.W.3d 421, 426 (Mo. App.1999). Our review is therefore limited to a determination of whether, as a matter of law, the trial court abused its discretion in refusing to grant a request for a mistrial. *Id.*

We find no such abuse of discretion here. Point II is denied.

### Conclusion

The judgment is affirmed.

BARNEY, P.J., and GARRISON, J., concur.